EUGENIA GONCAVES, Indiv. and as Adm'r of the Estate of Altair Gon-
caves, Deceased, *et al.*, Plaintiffs-Appellees, v. SALIM B. SAAB, Defend-
ant-Appellant (St. Anne's Hospital *et al.*, Defendants).

First District (5th Division)   No. 1—86—3046

Opinion filed March 31, 1989.

PINCHAM, J., dissenting.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, William J. Oberts, Mary C. O'Connor, and Lisa Marco Kouba, of counsel), for appellant.

954

Mitchell L. Hoffman, of Albert Brooks Friedman, Ltd., and Alan O. Amos & Associates, P.C., both of Chicago, for appellees.

PRESIDING JUSTICE LORENZ delivered the opinion of the court:

On July 29, 1988, we filed our original opinion in this matter. Subsequently, we granted plaintiff-appellant's motion for rehearing. The parties submitted additional briefs and we allowed additional oral argument on the motion.

This appeal involves a grant of post-judgment relief (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401) vacating an order for summary judgment (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005) which dismissed Salim B. Saab, M.D., as a party defendant in a medical malpractice action.

We reverse, vacate the trial court's order granting post-judgment relief, and direct the trial court to reinstate the order of summary judgment.

The following chronology is pertinent to our disposition.

On December 10, 1982, Altair Goncaves was taken to the emergency room of St. Anne's Hospital in Chicago, Illinois, following an automobile collision from which he suffered serious injuries and later died. Dr. David C. Mayor was the emergency room physician who treated the decedent. Dr. Salim B. Saab was the on-call thoracic surgeon that night.

On November 17, 1983, Eugenia Goncaves, individually and in representative capacities, and Tony Goncaves (plaintiffs) filed their original complaint for medical malpractice in this cause in the circuit court of Cook County. The complaint named several respondents in discovery and included Saab and St. Anne's Hospital as party defendants. The complaint did not name Mayor.

On February 6, 1984, Saab was deposed. Relevant here, Saab testified he had no recollection of ever seeing the decedent or of being consulted over the telephone on December 10, 1982, regarding the decedent's treatment. Saab maintained this assertion even though plaintiffs' attorney pointed out that the emergency room chart contained both a notation to call Saab as well as included Saab's name within a box labeled "referral" and that the emergency room physician's orders sheet contained two notations to consult with Saab.

On February 24, 1984, by agreed order, Saab was granted leave to file a motion for summary judgment on the ground that he did not care for, examine, or treat plaintiffs' decedent. The motion was sup-

ported with Saab's affidavit to that effect. Hearing on the matter was continued to April 9, 1984. (Pursuant to several subsequent orders entered upon agreement of the parties, the date for hearing on the motion was set for September 25, 1984.)

On March 2, 1984, plaintiffs' expert, Dr. Kenneth Chessick, rendered his report to plaintiffs' attorney. The report detailed a review of previously unsupplied medical records and set forth Chessick's opinions as a basis for establishing malpractice. The report concluded several actors were negligent in the treatment of plaintiffs' decedent, including emergency room personnel for their failure to promptly contact a surgeon. Significantly, the first page of the report, containing what appears to be typewritten reproductions of hospital records, twice refers to Mayor. At the second reference, his name is contained in underscored text.

On April 13, 1984, plaintiffs amended their original complaint. At that time, Mayor was also added as a party defendant. Plaintiffs' single effort to serve Mayor by delivering a copy of the complaint to St. Anne's Hospital was unsuccessful.

On September 24, 1984, one day prior to the scheduled hearing on Saab's motion, plaintiffs filed a separate action against Mayor. Mayor was successfully served with summons in that action on the following day.

On September 25, 1984, without opposition from plaintiffs, Saab's motion for summary judgment was granted.

On September 3, 1985, Mayor was deposed. Mayor testified, *inter alia*, that he had consulted with Saab over the telephone regarding treatment of plaintiffs' decedent on December 10, 1982. He stated that he contacted Saab because Saab was the on-call thoracic surgeon.

On November 8, 1985, plaintiffs filed their petition for post-judgment relief, the subject of this appeal. Plaintiffs sought thereby to vacate the judgment rendered in favor of Saab in light of Mayor's deposition testimony. The petition stated that the testimony of Mayor "was not available" at the time Saab's motion for summary judgment was heard. Referring to Saab's statements concerning the telephone call, plaintiffs contended that that judgment was procured by fraud on the part of Saab which was "not discoverable" until Mayor was "served with process and depositions taken."

On September 30, 1986, the trial court granted plaintiffs' petition and vacated the order of summary judgment in favor of Saab. A timely notice of appeal was filed on October 28, 1986.

OPINION

Pursuant to section 2—1401, the Code of Civil Procedure provides a simple petition process affording parties, when appropriate, "[r]elief from final orders and judgments, after 30 days from the entry thereof." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401.) A section 2—1401 petition is addressed to the equitable powers of the trial court (*People v. Alfano* (1981), 95 Ill. App. 3d 1026, 420 N.E.2d 1114) and allows a party to bring before the court matters unknown to both the parties and the court at the time of judgment which would have precluded its entry. (*Manning v. Meier* (1983), 114 Ill. App. 3d 835, 449 N.E.2d 560.) Because a petition under section 2—1401 constitutes a new proceeding separate from that in which the judgment challenged was rendered (Ill. Rev. Stat. 1985, ch. 110, par. 2—1401(b)), the petitioner must allege and prove a right to the relief sought as in any other civil action. *Reuben H. Donnelley Corp. v. Thomas* (1979), 79 Ill. App. 3d 726, 398 N.E.2d 972.

Generally, to prevail under section 2—1401, petitioner must show both that if the grounds for relief had been known when the judgment complained of was rendered, entry thereof would have been precluded, and that the failure to discover and present the ground for relief was not the result of the petitioner's own lack of diligence. (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 433 N.E.2d 253.) In determining diligence, courts examine whether the petitioner, at the time of entry of the judgment and after making every effort in his power, failed to raise or discover the grounds asserted through no fault or neglect of his own. (*Crane Co. v. Parker* (1922), 304 Ill. 331, 136 N.E. 733; *Brockmeyer v. Duncan* (1960), 18 Ill. 2d 502, 165 N.E.2d 294.) The requirement of diligence effectively denies petitioners new opportunity to do that which should have been done at the earlier proceeding. (*Petrauskas v. Motejunas* (1971), 133 Ill. App. 2d 293, 272 N.E.2d 805.) Satisfaction of that requirement, however, does not demand that the petitioner anticipate improper conduct. Thus, where actual fraud or unconscionable conduct has played a part in the rendering of the judgment from which relief is sought, the requirement of diligence is not rigidly enforced. (*Department of Public Works & Buildings v. O'Hare International Bank* (1976), 44 Ill. App. 3d 934, 358 N.E.2d 1308.) Therefore, while operation of section 2—1401 may relieve petitioners from adverse judgments because of discovery of matter not previously appearing in the record, relief is not afforded when that matter should have been presented and the petitioner reasonably could have done so.

On appeal, Saab does not dispute that Mayor's deposition testimony, had it been presented, would have prevented the entry of summary judgment. Rather, Saab contends that evidence could easily have been discovered prior to entry of the judgment and, therefore, because plaintiffs were not diligent, it was an abuse of discretion for the court below to grant the petition for relief.

■ We agree. In our opinion, the failure to generate discovery to procure Mayor's testimony, and thereby create an issue of fact precluding summary judgment, occurred because Saab's motion was not earnestly contested through means which were readily available prior to entry of the judgment. Plaintiffs' counsel did not oppose the motion for summary judgment on the basis of Saab's deposition testimony in which Saab stated he did not remember receiving a telephone call from the emergency room regarding treatment of plaintiffs' decedent on December 10, 1982. Had plaintiffs' counsel contested the accuracy of Saab's recollections, rather than accept Saab's statements at face value, the only and obvious way to do so would be to interview emergency room personnel present on that date to determine whether such a telephone call was, in fact, made.

Review of the record indicates that the identity of Mayor as a material witness for that purpose should have been clear when Saab was deposed on February 6, 1984, more than seven months prior to entry of summary judgment. It was apparent that Mayor was the emergency room physician on December 10, 1982. Although never served with process, the amended complaint names Mayor as a party defendant in that capacity. The emergency room chart and physician's orders sheet for that night contain references to Saab. The significance of both documents was not lost on plaintiffs' counsel. During the deposition of Saab, plaintiffs' counsel, referring to those documents, repeatedly questioned Saab as to whether he received a telephone call from the emergency room regarding treatment of plaintiffs' decedent. Although the documents contain similar signatures, both of which are illegible to this court, plaintiffs have not contested assertions contained in the brief for Saab that both documents were signed by Mayor.

However, any doubt of Mayor's identity as a material witness is dispelled by the inclusion of Mayor's name in the report prepared by plaintiffs' expert in anticipation of litigation. The report specifically recites that the failure of the emergency room personnel, including the emergency room physician, to contact a surgeon regarding treatment of plaintiffs' decedent constituted negligence. Mayor's name appears twice on the first page of the report. At the second reference,

Mayor's name is contained in underscored text.

Despite the possession of that material, the record indicates that from April 13, 1984, when Mayor was added as a party defendant, until entry of summary judgment on September 25, 1984, no attempt was made to depose Mayor. In our opinion, reasonable diligence in opposing Saab's motion for summary judgment dictated discovery should have been generated for the purpose of securing a statement from Mayor pertaining to the telephone call.

Plaintiffs' counsel contends that the failure to depose Mayor was attributable solely to the "deceptive conduct" of Saab during his deposition rather than a lack of diligence on the part of plaintiffs' counsel. Reliance is placed principally on *Lubbers v. Norfolk & Western Ry. Co.* (1984), 105 Ill. 2d 201, 473 N.E.2d 955, and *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 433 N.E.2d 253.

We find neither decision applicable. As this court pointed out in a thorough discussion of those cases in *Malek v. Lederle Laboratories* (1987), 152 Ill. App. 3d 493, 504 N.E.2d 893, both *Lubbers* and *Ostendorf* involved situations in which defendants actively concealed evidence. That act of concealment, in each case, precluded discovery of the evidence through other reasonable means.

■ Here, although plaintiffs claim Saab intentionally misrepresented that he did not receive the telephone call, we find nothing in the record to support that contention. Moreover, such a misrepresentation, even if substantiated, in no way prevented plaintiffs from discovering the evidence necessary to refute those statements and thereby raise an issue of fact to avoid summary judgment. Plaintiffs merely had to depose Mayor to determine the accuracy of Saab's recollection. Instead, plaintiffs elected to rely on Saab's memory and allowed summary judgment to be entered.

■ Relaxation of the diligence requirement is not justified under such circumstances. Section 2—1401 was not designed to relieve petitioners of their responsibilities to avoid the consequences of adverse judgments occasioned through their own neglect in the prosecution of an action. (*Malek v. Lederly Laboratories* (1987), 152 Ill. App. 3d 493, 504 N.E.2d 893.) Because plaintiffs could readily have discovered the matter asserted as the basis for the instant petition, there exists no reason to lessen the diligence burden. For the same reasons, we are likewise unpersuaded by plaintiffs' contentions that entry of summary judgment in the instant case was predicated on unconscionable circumstances· such as might excuse that requisite showing.

We therefore conclude that it was an abuse for the court below

to disturb the finality of the judgment which dismissed Saab as a party defendant.

Accordingly, we reverse, vacate the trial court's order granting post-judgment relief, and direct the trial court to reinstate the order of summary judgment.

Reversed and remanded with directions.

COCCIA, J.,* concurs.

JUSTICE PINCHAM, dissenting:

Following my original dissenting opinion to the original majority opinion, both of which were withdrawn upon the granting of plaintiff-appellant Goncaves' petition for rehearing, upon rehearing I again dissent.

The summary judgment dismissing plaintiffs' complaint against the defendant, Dr. Salim B. Saab, the thoracic surgeon at defendant St. Anne's Hospital who was on call when the decedent was administered emergency treatment there by the emergency room physician, Dr. David L. Mayor, was based on Dr. Saab's affidavit and deposition testimony that he did not receive a telephone call from the emergency room concerning the decedent and that he had nothing to do with the decedent's consultation, treatment or care. The trial court found that this affidavit and deposition testimony of Dr. Saab were false and were first discovered to be such after the summary judgment had been entered. There is abundant support in the record for the trial court's findings. Predicated on these findings, the trial court properly granted plaintiffs' section 2—1401 post-judgment petition and vacated the summary judgment. The trial court did not abuse its discretion in so doing. Conversely, the trial court would have grossly abused its discretion had it not granted plaintiff's motion and vacated the summary judgment. I therefore do not agree with the majority's reversal of the trial court's order, or the grounds on which the majority predicates its reversal thereof, i.e., plaintiff was not diligent in discovering Dr. Saab's falsehoods before the summary judgment was entered. Dr. Saab was a licensed surgeon and as such he held a highly credible position and was perceived in society to be an exceedingly credible person. As a licensed physician and surgeon he had taken and was bound

---

*Justice John J. Sullivan originally participated in the majority opinion. Following Justice Sullivan's resignation from the court, Justice Michael A. Coccia was designated the third member of the panel and participated in this disposition.

by the Oath of Hippocrates.[1] Reliance on his credibility was warranted. People entrusted him with their health, medical care and treatment, and, indeed, with their lives, sight previously unseen and with no knowledge of him. A lawyer should not be required by the law to posthaste automatically check or make certain that he has not lied about his performance of his professional responsibilities, and plaintiff should not be held to have forfeited her cause of action against him for her lawyer not having done so within an unspecified time. More importantly, Dr. Saab should not be allowed by his unseemly deception to avoid the consequences of his failure to properly perform his professional duties. He should not be permitted to avoid his professional irresponsibility or benefit from his lack of integrity. I would therefore affirm the trial court's order vacating dismissal of plaintiffs' complaint against Dr. Saab.

---

[1]The Oath of Hippocrates states: "I SWEAR BY APOLLO. THE PHYSICIAN-AND AESCULAPIUS-AND HEALTH-AND ALL HEAL-AND ALL THE GODS AND GODDESSES-THAT ACCORDING TO MY ABILITY AND JUDGMENT-I WILL KEEP THIS OATH AND THIS STIPULATION-TO RECKON HIM WHO TAUGHT ME THIS ART EQUALLY DEAR TO ME AS MY PARENTS-TO SHARE MY SUBSTANCE WITH HIM & RELIEVE HIS NECESSITIES IF REQUIRED-TO LOOK UPON HIS OFFSPRING IN THE SAME FOOTING AS MY OWN BROTHERS-AND TO TEACH THEM THIS ART-IF THEY SHALL WISH TO LEARN IT-WITHOUT FEE OR STIPULATION-AND THAT BY PRECEPT-LECTURE & EVERY OTHER MODE OF INSTRUCTION-I WILL IMPART A KNOWLEDGE OF THE ART TO MY OWN SONS-AND THOSE OF MY TEACHERS-AND TO DISCIPLES BOUND BY A STIPULATION AND OATH ACCORDING TO THE LAW OF MEDICINE-BUT TO NONE OTHERS-I WILL FOLLOW THAT SYSTEM OF REGIMEN WHICH-ACCORDING TO MY ABILITY AND JUDGMENT-I CONSIDER FOR THE BENEFIT OF MY PATIENTS-AND ABSTAIN FROM WHATEVER IS DELETERIOUS AND MISCHIEVOUS-I WILL GIVE NO DEADLY MEDICINE TO ANYONE IF ASKED-NOR SUGGEST ANY SUCH COUNSEL-AND IN LIKE MANNER I WILL NOT GIVE TO A WOMAN A PESSARY TO PRODUCE ABORTION-WITH PURITY & WITH HOLINESS I WILL PASS MY LIFE & PRACTICE MY ART I WILL NOT CUT PERSONS LABORING UNDER THE STONE-BUT WILL LEAVE THIS TO BE DONE BY MEN WHO ARE PRACTITIONERS OF THIS WORK-INTO WHATEVER HOUSES I ENTER-I WILL GO INTO THEM FOR THE BENEFIT OF THE SICK-AND WILL ABSTAIN FROM EVERY VOLUNTARY ACT OF MISCHIEF & CORRUPTION-AND FURTHER-FROM THE SEDUCTION OF FEMALES OR MALES-OF FREEMEN AND SLAVES-WHATEVER-IN CONNECTION WITH MY PROFESSIONAL PRACTICE-OR NOT IN CONNECTION WITH IT-I SEE OR HEAR-IN THE LIFE OF MEN-WHICH OUGHT NOT TO BE SPOKEN OF ABROAD-I WILL NOT DIVULGE AS RECKONING THAT ALL SUCH SHOULD BE KEPT SECRET-WHILE I CONTINUE TO KEEP THIS OATH UNVIOLATED-MAY IT BE GRANTED TO ME TO ENJOY LIFE AND THE PRACTICE OF THE ART-RESPECTED BY ALL MEN-IN ALL TIMES-BUT SHOULD I TRESPASS AND VIOLATE THIS OATH-MAY THE REVERSE BE MY LOT."

On December 10, 1982, at 1 a.m., Altair Goncaves, plaintiffs' decedent, was brought to the emergency room of defendant St. Anne's Hospital for treatment of injuries he sustained in an automobile accident. Goncaves was treated by Dr. David Mayor, who was the emergency room physician at the hospital that morning. Goncaves' emergency room chart reflects that as late as 1:35 a.m., Goncaves was awake, alert and oriented with pulses present and regular heart sounds. No breath sounds were noted from the left lung, however, and at 1:45 a.m. a chest X ray was taken which revealed a hemopneumothorax and possible fractured clavicle. Dr. Mayor inserted a tube in Goncaves' chest to remove the air from his thorax and to reexpand his lung. Additional X rays and tests were taken, of which Dr. Mayor was apprised and at approximately 3:50 a.m. Dr. Mayor performed an abdominal tap on Goncaves for additional testing. At approximately 6 a.m., Goncaves was transferred to the surgical intensive care unit, where, at 7:30 a.m., he suddenly exhibited excessive bleeding through the chest tube and expired.

Dr. Kenneth C. Chessick, plaintiffs' expert, concluded that the decedent "died from exsanguinating hemorrhage from a combination of chest injury and an intra-abdominal source. He had signs and studies which required that he be seen promptly by a general surgeon and be given diagnostic and therapeutic exploratory laparotomy (operation) to control this bleeding. The failure to do so resulted in his preventable death. I find evidence of negligence on the part of multiple factors. *** Delay of almost three hours before a surgeon was contacted is excessive ***. This represents negligence by the hospital emergency room personnel in failing to contact a general surgeon, by the floor nurse in failing to notify the staff general surgeon and thoracic surgeon, and by the attending surgeons."

On Goncaves' emergency room admission record there appears the notation:

"4. Call Dr. Saab—call Dr. Anagnost."

The physician's orders section of the Goncaves' medical chart signed by Dr. Mayor similarly states:

"1. Admit to Dr. Anagnost
2. Consult: Dr. Saab."

Dr. Saab and Dr. Anagnost, respectively, were the thoracic and general surgeons who were on call during that morning.

The decedent's wife, Eugenia Goncaves, individually, as administrator of the decedent's estate and as next of friend of Thomas Goncaves and Tony Goncaves, filed the instant four-count complaint on November 17, 1983, alleging medical malpractice against the defend-

ants St. Anne's Hospital and Dr. Salim B. Saab. The complaint alleged, *inter alia*, the commission or omission of various acts of negligence by Dr. Saab in his consultation and treatment of the decedent. In Dr. Saab's verified answer he "specifically denie[d] that he had any duty with respect to the plaintiff's decedent and further denie[d] the violation of any such duty."

On February 6, 1984, plaintiffs' attorney deposed defendant, Dr. Salim Saab, during which Dr. Saab denied that he ever received a telephone call concerning Altair Goncaves, the decedent, from St. Anne's emergency room physician, and further denied that he had anything to do with the decedent's consultation, treatment or care.

Dr. Saab testified that he became board-certified in general surgery in 1970 and in thoracic and cardiovascular surgery in 1971. He came to Chicago in July 1980 and established a private practice. Dr. Saab testified that in 1982 he practiced in partnership with Dr. Paul Naffah and that they both were on the medical staff at St. Anne's Hospital as thoracic and cardiovascular surgeons. Dr. Saab related that although he was the thoracic surgeon on call at St. Anne's Hospital on the morning that the decedent was a patient and died there, December 10, 1982, he stated that he did not treat the decedent and that he was not contacted by phone or by any other means regarding the care or treatment of the decedent. Dr. Saab further related that it was Dr. Naffah who had attempted the cardiac resuscitation of the decedent. Dr. Saab was shown and reviewed the medical charts of the decedent, whereupon he testified pursuant to questions put to him by plaintiffs' counsel:

"Q. And I want to show you a medical record—Did you see the complete medical record of St. Anne's Hospital of [decedent] Altair Goncaves?

A. Yes.

\* \* \*

Q. Doctor, I see here that it says here that Dr. Naffah attempted cardiac resuscitation in the intensive care unit, is that correct?

A. Correct.

Q. And that's what your record shows?

A. Correct.

Q. And you never saw this patient?

A. No.

Q. *Were you ever called on the telephone to see him?*

A. *No, not that I recollect.*

\* \* \*

Q. Doctor, tell me what your practice is when you receive a phone call during the night when you are on call for thoracic and cardiovascular surgery at St. Anne's Hospital.

A. *** It depends on what the phone call is about.

Q. When you receive a telephone call, Doctor, that there is an emergency in a cardiovascular case—

A. I respond to it in what I think is an appropriate way. *If it is an emergency, it means I should go to the hospital.*

Q. Did you go to the hospital that night?

A. You are assuming I got a phone call.

Q. I am asking you; did you go to the hospital that night?

A. No.

Q. *You do not know whether or not you received a phone call?*

A. *I know that I did not.*

Q. *How do you know that you did not receive a phone call?*

A. *Because if I did, I would have responded.*

* * *

Q. Doctor, I am asking you to look at the indication on the hospital record under 'Referral.' Under 'Treatment' it says, 'Called Dr. Saab.' You read that; correct?

A. Right.

* * *

Q. Dr. Naffah and you would be on call, and they would merely call you, is that right?

A. Right.

Q. *Do you recall receiving a telephone call at 3:50 concerning [the decedent] Mr. Goncaves?*

A. *No.*

* * *.

Q. Have you ever discussed [this case] with Dr. Naffah?

A. Briefly after I got the subpoena.

* * *

Q. Can you tell me, to the best of your recollection, what you said to him and what he said to you concerning that?

A. I just asked him, 'What is this case all about,' because I couldn't remember anything about the patient myself or having been involved, and I asked him if he were involved with this patient or not.

Q. And what did he say to you?

A. And he said, 'Yes,' he was involved. *** [T]hat this patient was presented to St. Anne's Hospital after having sus-

tained some kind of trauma, and at a certain point in time he participated in his case.

\* \* \*

Q. Doctor, if you saw this record, then you also saw in the physician's orders that it stated that the second one was—1 was admitted to Dr. Anagnost; 2 was to consult Dr. Saab; and 15 was, 'call Dr. Anagnost or Saab if any acute change.' Are you aware of that notation?

A. Yes, I read it.

\* \* \*

Q. There was a consultation suggested with you?

A. Right.

\* \* \*

Q. Under there it's checked, 'Referral,' it says, 'Referral, 3:50' with a thing to Dr. Saab. Your name has been written on there twice, is that correct?

A. Yes.

Q. And then your name is written on another portion of that file stating that somebody again suggested that you be consulted and called if there is an acute change, is that correct?

A. That's what the orders say.

\* \* \*

Q. Doctor, it is—notwithstanding those notations, you testified that *you have no recollection of any phone call being made to you or any consultation being made to you, is that correct?*

A. *Correct.*" (Emphasis added.)

If there remained any possible doubt from Dr. Saab's forgoing deposition testimony that he intended to relate that he had absolutely nothing to do with the consultation, treatment or care of Altair Goncaves at St. Anne's Hospital, such doubt was promptly dispelled by the following deposition testimony of Dr. Saab subsequently elicited from Dr. Saab at the deposition by Dr. Saab's own attorney, Mary O'Connor:

"Q. Doctor, did you ever treat or order any medication or tests for Altair Goncaves?

A. No.

Q. Did you ever at any time physically monitor this patient's care or his clinical status?

A. No.

Q. *Did you ever advise in any medical capacity as to the care and treatment that was to be taken for this patient?*

A. *No.*

Q. Doctor, does your name appear on any of the physician's orders or any consultations that may appear on the chart?

A. Except as quoted by others, not by me.

Q. *Did you, yourself, ever author any physician's orders or consultation in the chart?*

A. *No, no."* (Emphasis added.)

The record reflects that on March 5, 1984, one month after plaintiffs' attorney deposed Dr. Saab, plaintiffs' attorney received a five-page report, dated March 2, 1984, from his expert, Dr. Kenneth C. Chessick, in which Dr. Chessick stated that he had received Altair Goncaves' hospital records from St. Anne's Hospital, from which he found "numerous negligent acts which were proximately causally related to this patient's death[ ] *** [and] strong evidence of medical malpractice." Pertinent to the issues on this appeal, Dr. Chessick stated in his findings that the 37-year-old decedent

"died from exsanguinating hemorrhage from a combination of chest injury and an intra-abdominal source. He had signs and studies which required that he be seen promptly by a general surgeon and be given diagnostic and therapeutic exploratory laparotomy (operation) to control this bleeding. The failure to do so resulted in his preventable death.

I find evidence of negligence on the part of multiple factors. These are listed as follows:

1. Delay of almost three hours before a surgeon was contacted is excessive; I can find no evidence that a surgeon or attending physician (or resident) ever saw the patient after arrival in the hospital. This represents negligence by the *** attending surgeons.

2. Six hours in ER is excessive ***. The ER physician was obligated to obtain a general surgeon to assume active management of the patient prior to discharge from the emergency room to the hospital floor. Failure to do so was negligent.

3. The failure to perform exploratory surgery for probable major intra-abdominal injury of major proportion is negligent; it is probable that the patient had continued and unrecognized intra-abdominal bleeding. The finding of a positive abdominal tap (presence of blood) is usually considered to be a strong indication for immediate exploratory abdominal surgery. This is particularly the situation where a physician is not available to perform serial diagnostic physical examinations. The failure to do so was negligent by the attending general surgeon and tho-

racic surgeon. * * *

4. The patient had evidence of intra-abdominal bleeding and should have received transfusions before he went into shock as determined by serial clinical examinations and evidence of a falling hemocrit and hemoglobin. The failure to transfuse in the presence of bleeding was negligence by the emergency room physician, the general surgeon, and the thoracic surgeon.

5. The failure to obtain arterial blood gases ($pO_2$, $pCo_2$, and pH) in a patient with major trauma to the lungs, tension pneumothorax, and a respiratory rate in excess of 24 is negligence by the emergency room physician, general surgeon, and thoracic surgeon. * * *

6. The failure to perform an intravenous pyelogram (I) in a patient with major abdominal trauma and hematuria is negligence by each doctor involved.

7. The failure to perform an EKG in a patient with major chest trauma is negligence by each doctor involved.

8. The failure to insert a nasogastric tube in a patient with multiple trauma is negligence by each doctor involved.

* * *

Summary:

There are multiple negligent acts by the emergency room physician, the general surgeon, the thoracic surgeon, and the hospital through its nurses which resulted in this patient's being mismanaged. This negligence resulted in the patient's death. But for this negligence, it is more probable than not that the patient would have survived."

However, based upon Dr. Saab's foregoing deposition testimony of February 6, 1984, that he had not been called by the emergency room physician and had nothing to do with the treatment or consultation of decedent at St. Anne's Hospital, Dr. Saab, on February 24, 1984, filed his motion for summary judgment to be dismissed as a party defendant. The motion stated that plaintiffs' complaint alleged that on December 10, 1982, Dr. Saab carelessly and negligently cared for and treated the decedent, Altair Goncaves, while he was a patient at St. Anne's Hospital and that as a result of Dr. Saab's careless and negligent acts and omissions, the decedent sustained injuries which caused him to expire on December 10, 1982. Dr. Saab's motion for summary judgment further stated that he was licensed to practice medicine in the State of Illinois; that he was board-certified in the field of cardiovascular and thoracic surgery, and that:

"[T]he doctor states, under oath, that on December 10, 1982,

he did not examine, care for nor treat the plaintiffs' decedent, Altair Goncaves, at St. Anne's Hospital and further that at no time prior or subsequent to December 10, 1982, did he examine, care for or treat the plaintiffs' decedent, Altair Goncaves."

Dr. Saab's motion for summary judgment further asserted that there was no genuine issue on the fact that he had nothing to do with the decedent's consultation, treatment or care at St. Anne's Hospital.

Dr. Saab's affidavit, subscribed and sworn to by him on January 5, 1984, was presented with and in support of his motion for summary judgment, and stated in pertinent part as follows:

"SALIM B. SAAB, M.D., being first duly sworn on oath, deposes and states as follows:

1. That I am one of the Defendants in this cause.

2. That I have personal knowledge of the matters contained in this Affidavit and if called upon to testify would be competent to testify thereto.

3. That I am a physician licensed to practice medicine in the State of Illinois and am Board Certified in the field of cardiovascular and thoracic surgery.

4. That at no time during the Plaintiffs' Decedent, ALTAIR GONCAVES' stay at St. Anne's Hospital did I examine, care for or treat the said ALTAIR GONCAVES, as alleged in the Plaintiff's Complaint.

5. That at no time prior or subsequent to December 10, 1982 did I ever come in contact with the Plaintiff/Decedent, ALTAIR GONCAVES, nor have I ever seen ALTAIR GONCAVES."

In reliance on the integrity of Dr. Saab, a licensed physician board-certified in the field of cardiovascular and thoracic surgery, and the veracity of his affidavit and deposition testimony that he had nothing to do with the decedent at St. Anne's Hospital, plaintiffs and her attorney agreed to the entry of the February 24, 1984, order granting Dr. Saab leave to file his motion for summary judgment, and they did not subsequently contest the entry of summary judgment on September 25, 1984, dismissing Dr. Saab as a party defendant.

On September 3, 1985, plaintiffs' attorney deposed Dr. David Mayor. Dr. Mayor's deposition disclosed that he was the emergency room physician on call at St. Anne's Hospital on the morning that the decedent was admitted. Dr. Mayor's deposition testimony contradicted Dr. Saab's affidavit and deposition testimony that Dr. Saab

had nothing to do with the decedent at St. Anne's Hospital. Dr. Mayor testified that he had in fact contacted and consulted with Dr. Saab regarding the decedent on the morning of December 10, 1982, due to the extensive nature of the decedent's injuries. Dr. Mayor stated that he contacted Dr. Saab because Dr. Saab was the thoracic surgeon on duty call that morning. Dr. Mayor further related that although he consulted with Dr. Saab about the patient-decedent, Altair Goncaves, Dr. Saab refused to come to the hospital or to take active control of the patient.

Dr. Mayor related that Mr. Goncaves was given a chest X ray at 1:45 a.m., and because Mr. Goncaves had a pneumothorax, he inserted a chest tube. Dr. Mayor stated that "a pneumothorax is a lung that is collapsed and pneumo means that there is air, the thorax means outside of the lungs but in the thorax." Mr. Goncaves had several fractured ribs and a fractured clavicle which showed on the X ray. The chest tube is a round clear plastic tube approximately 18 inches in length. Dr. Mayor prepared the area in the anterial lateral chest and did a minithoracotomy, *i.e.*, "he incised the skin, threaded down to the ribs, up over the ribs, punctured the pleura and slid the tube in it. The function of the chest tube was to take the air out of the thorax, which would re-expand the lung. A puncture of a lung possibly by one of his ribs was the cause for the air in between his lung lining and the inside lining of his chest." Dr. Mayor related that pneumothorax was a dangerous condition, which if left untreated could lead to death.

It is at this juncture in Dr. Mayor's testimony that Dr. Mayor contradicted the testimony of Dr. Saab that he never received a telephone call from the emergency room and had nothing to do with the deceased. Dr. Mayor testified in further response to questions by plaintiffs' counsel, as follows:

"Q. Then what did you do, if anything?

A. *I called Dr. Saab.*

Q. *Who is he?*

A. *He is the thoracic surgeon who was on call.*

* * *

Q. Do you have a list of all these people that is in the emergency?

A. He was on call then.

Q. Excuse me, did you have a list on the wall?

A. Yes.

Q. He is a thoracic surgeon?

A. Yes.

Q. About what time did you call him?

A. Usually what I do after I place a chest tube in and ask for a second chest x-ray, and I see that my immediate job of expanding the lung so this person can breathe has been taken care of, I request that the thoracic surgeon be called at that time.

Q. Why?

A. Because he will need to be involved in that patient's care.

Q. *What time did you call Dr. Saab?*

A. *He answered his call, and I talked to him at 3:50.*

Q. Do you remember what the conversation was between you and him.

A. I have a routine procedure that I go through when I talk to physicians about a patient. I explain to them the history that I have. I explain to them his physical findings. I explain to them the procedures that I have done, and then I ask them if they would like anything else done.

Q. *What did he say?*

A. *He said that because the initial output was only 600 cc's and had decreased, that to watch the subcutaneous emphysema and to contact the general surgeon, and that he would be a consult for the case.*

Q. But he wasn't—*did he indicate he was not coming over?*

A. When I initially asked him to come over and after he heard my description of what had happened and how stable the patient was, *he said that—to call him if there was any change* and after I had explained to him I felt accurately the patient's condition—I felt comfortable with his statement, even though *initially my request was that he should come in and see the patient.*

Q. *Did he ever come in and see the patient while the patient was in the emergency room?*

A. *No.*

Q. What happened after you called Dr. Saab and he said that he wasn't coming in and you could call him back if there was any change?

A. I—after I got the—several more chest or several more x-rays to evaluate again the pain that he was complaining of in the back, and when I received the results back from the tap, I called the general surgeon on call.

Q. Why did you do that?

A. Because per request of Dr. Saab, he would be a consulting physician for the case and he would be like a general surgeon to manage the case generally.

Q. What was there to manage? You said the man was stable?

A. Anytime that there is an auto accident, even though the chest trauma is involved, since there is a possibility of other trauma involved developing, it is usual to have a general surgeon be the coordinating surgeon on a case.

Q. So you called the general surgeon, correct?

A. Correct.

Q. By the way, *did you reach Dr. Saab at his home?*

A. The call was placed by one of the nurses and *I was given the phone and he was on the phone.*" (Emphasis added.)

This foregoing deposition testimony of Dr. Mayor directly conflicts with the contrary prior deposition testimony of Dr. Saab that he was never telephonically contacted about and had absolutely nothing to do with the consultation, care or treatment of the decedent.

In this court Dr. Saab does not dispute the merits of plaintiffs' medical malpractice claim against him. The defendant St. Anne's expert, Dr. Terrance Carden, testified at his deposition on August 19, 1985, two weeks before Dr. Mayor's deposition, that Dr. Saab's failure to respond appropriately to the decedent's medical emergency by going to the hospital and properly examining, treating and caring for the decedent deviated from and breached the accepted standard of care. When asked if he had any criticism of the care the admitting physicians rendered to the decedent, Dr. Carden responded that his criticism was that "some doctor did not come in and evaluate and take active control of the patient." Dr. Carden further testified that the failure of Dr. Anagnost or Dr. Saab to come in and take active control and management of the patient was a departure from and was a violation of the standard of care because of the decedent's condition when they were called. Dr. Carden additionally related, "The patient had multiple trauma, was known to have a hemopneumothorax, and was being admitted to an intensive care area *** some doctor has to come and take care of that patient, when the patient is admitted to the hospital. That's a universal standard of care."

Following and based upon Dr. Mayor's deposition of September 3, 1985, which contradicted Dr. Saab's deposition that he had not been called and had nothing to do with the consultation, treatment or care of the decedent, plaintiffs' attorney on November 8, 1985,

filed a petition pursuant to section 2—1401 of the Illinois Code of Civil Procedure to vacate the summary judgment dismissing Dr. Saab as a party defendant. Plaintiffs' petition to vacate asserted that Dr. Saab's affidavit and deposition testimony that he had not been called and had nothing to do with the consultation or treatment of the decedent, upon which the summary dismissal judgment was exclusively predicated, were false and perjurious and were unknown to be such when plaintiffs' attorney agreed to the entry of and when the court entered the summary dismissal judgment. Plaintiffs' petition to vacate further asserted that, "Salim Saab, M.D., procured summary judgment by reason of fraud," that, *"by reason of his fraud and testifying falsely at his deposition and in affidavit* in support of his motion for summary judgment that his motion or summary judgment was granted," that, "it would amount to constructive and actual fraud upon this court to allow the summary judgment to stand *which judgment was procured by perjured testimony and affidavit,"* that, "the defendant, Salim Saab, M.D., had been out of the case as a result of his own misconduct," and that, "Salim Saab, M.D., procured a motion for summary judgment by reason of fraud which was not discoverable until David Mayor, M.D., was served with process and deposition taken."

Dr. Saab's 13-page response memorandum, in opposition to plaintiffs' motion to vacate the summary judgment dismissing him as a party defendant, did not deny or dispute plaintiffs' assertion that the summary judgment was predicated on Dr. Saab's perjured affidavit and deposition testimony; rather, Dr. Saab simply contended that plaintiffs were not diligent in discovering that his affidavit and deposition testimony were false. Plaintiffs urge that the mere statement of Dr. Saab's contention demonstrates its absurdity.

Dr. Saab admitted in his response memorandum that, "at the time of the incident, the decedent was attended to primarily by Dr. David Mayor, the emergency room physician on duty in the morning in question [and] Salim Saab, M.D., was the cardiovascular surgeon on call." Dr. Saab's response further conceded that, "the defendant, Salim Saab, M.D., filed a motion for summary judgment, based on his own affidavit and alleging that he had never been contacted or requested to come to the emergency room on December 10, 1982," and that based thereon a summary judgment dismissing him as a party defendant was entered. Dr. Saab's response urged that "plaintiff is seeking to rejoin Dr. Saab as a party defendant based on the testimony of Dr. Mayor, the emergency room physician, that in fact he did contact Dr. Saab on December 10, 1982. *Dr. Saab's response*

*further insisted that, the focus of the court's analysis should not be directed to the accuracy of Dr. Mayor's testimony,* but rather to the issue of whether plaintiff exercised due diligence in the first instance in obtaining this information." Thus, Dr. Saab contraposed that plaintiffs and her attorney should not have relied on the honesty and integrity of Dr. Saab, a licensed and board-certified surgeon, or on the veracity of his sworn deposition testimony or affidavit and should not have agreed to the entry of a summary judgment dismissing him from the case; rather, Dr. Saab insists, plaintiffs and her attorney should have promptly sought to establish that Dr. Saab was a perjurer, which neither plaintiffs nor her attorney suspected or had any reason to suspect.

Plaintiffs filed their reply to Dr. Saab's responsive memorandum which opposed plaintiffs' motion to vacate the summary judgment. Plaintiffs' reply stated that their medical malpractice complaint alleged that the defendants, St. Anne's Hospital, Dr. David Mayor, the emergency room physician who attended the decedent, Dr. Salim Saab, the thoracic surgeon on call, and Dr. Maria Anagnost, the general surgeon on call, were negligent in their treatment of the decedent. Plaintiffs' reply further stated that, "Dr. Saab answered the complaint denying the allegations against him. Subsequently Dr. Saab filed a motion for summary judgment, supported by his own affidavit, in which he swore that at no time did he examine, care for, treat, or come in contact with [decedent] Mr. Goncaves." Plaintiffs' reply also recited that while Dr. Saab's motion for summary judgment for his dismissal as a party defendant was pending, plaintiffs deposed Dr. Saab, during which Dr. Saab testified, "repeatedly that he did not treat the decedent and more importantly did not speak over the telephone with Dr. Mayor or give advice as to the care of the decedent." It was additionally set forth in plaintiffs' reply that Dr. Saab's motion for summary judgment was sustained "based on sworn testimony of Dr. Saab, as evidenced by his affidavit and his deposition testimony that he did not treat or consult or give advice to anyone regarding the decedent."

Plaintiffs' reply additionally pointed out that after the entry of summary judgment, plaintiffs on September 3, 1985, deposed Dr. Mayor, the emergency room physician, and that "Dr. Mayor directly contradicted Dr. Saab's previous testimony that he had never been consulted regarding decedent's condition via a telephone call." Plaintiffs' reply also stated that, "Dr. Mayor testified that he had called Dr. Saab as thoracic surgeon on call; that he had spoken to him at 3:50 a.m.; that he initially asked Dr. Saab to come over to the emer-

gency room and see the patient; that Dr. Saab stated he would not come *** ."

Plaintiffs' reply further disclosed to the trial court the significant conclusion that, "the experts, Dr. Kenneth Chessick for the plaintiffs, and Dr. Terrence Carden for the defendant, St. Anne's Hospital, have stated in report and in deposition testimony that Dr. Saab, the thoracic surgeon on call that night, by his refusal to come to the emergency room and examine the patient and take control if necessary, violated the standard of care in hospitals." Additionally, the trial court was informed in plaintiffs' reply that plaintiffs' petition to vacate the summary judgment was based on the fact that *"Dr. Saab obtained summary judgment by reason of his fraud and testifying falsely at his deposition and in his affidavit in support of his motion for summary judgment."*

Plaintiffs also stated in the reply:

"(1) [T]he summary judgment should be set aside as it was procured by the fraudulent conduct of the movant [Dr. Saab, who] fraudulently concealed, through his false deposition and affidavit testimony, that he acted as consulting physician on the day of decedent's death.

(2) Dr. Saab's response is totally revealing as to the fraud he perpetuated upon this court and the plaintiffs.

(3) *Dr. Saab 'does not deny the charge of fraudulent conduct* [or] that plaintiffs have a valid and meritorious cause of action against him.'

(4) Instead [Dr. Saab] argues plaintiffs were not diligent in discovering that his conduct was dishonest and fraudulent ***.

(5) Therefore, Dr. Saab argues, plaintiffs' petition [to vacate the summary judgment] should be denied."

Plaintiffs' reply concluded, *inter alia,* that *"summary judgment was obtained by [Dr. Saab] only through his giving knowingly false testimony* [and] that Dr. Saab's complaint and lack of due diligence in discovering the fraudulent concealment of evidence should not be heard and that [plaintiffs'] section 2—1401 petition to vacate the judgment obtained through unconscionable methods should be sustained."

When the attorneys appeared before the trial court and presented their oral arguments in support of and in opposition to plaintiffs' section 2—1401 petition to vacate the summary judgment, the trial court had before it for its consideration in ruling on the motion the aforementioned (1) plaintiffs' complaint; (2) Dr. Saab's answer to plaintiffs' complaint; (3) Dr. Saab's motion for summary judgment; (4) Dr. Saab's affidavit in support of his motion for summary judgment;

(5) Dr. Saab's deposition testimony, presented in support of his motion for summary judgment; (6) plaintiffs' section 2—1401 petition to vacate the summary judgment, and presented in support thereof; (7) Dr. David L. Mayor's deposition; (8) Dr. Kenneth Chessicks' deposition; and (9) Dr. Terrence Carden's report to plaintiffs' attorney; (10) Dr. Saab's answer and memorandum in opposition to plaintiffs' motion to vacate the summary judgment; and (11) plaintiffs' reply to Dr. Saab's answer and memorandum.

At one of the hearings of and prior to the trial court ruling on plaintiffs' motion to vacate the summary judgment, the trial court expounded, "[Y]ou are no doubt familiar even after judgment, *** it could be set aside where there was fraudulent concealment or absolute falsehoods about some of the facts. *** *I would like to be clear in my own mind as to the extent of the concealment here *** whether there are falsehoods on which the judgment is based.*" Thereupon, plaintiffs' attorney immediately retorted, "*[N]owhere in the response does Dr. Saab deny the untruthfulness of the statement he made both in his affidavit and in his deposition.*" Plaintiffs' attorney additionally stated to the trial court, "*[T]he deposition testimony of Dr. Saab,* which was taken shortly prior to *** when he was let out of this case on a motion for summary judgment *is clear and unequivocally false when he stated he was not contacted by anyone from the hospital.*" Plaintiffs' attorney further advised the trial court, "It seems quite clear that *since Dr. Saab doesn't deny the inaccuracies of his deposition and the affidavit testimony, then it is deemed admitted.*"

On the final dates of the hearing of plaintiffs' motion to vacate the summary judgment, plaintiffs' attorney again informed the trial court that, "*Dr. Saab, in his pleadings doesn't deny that there was a misstatement of fact in his affidavit and also in his discovery deposition,*" that, "[I]n Dr. Saab's reply not once does it—is it contended that Dr. Mayor was in error in his testimony. Instead, the thrust of Dr. Saab's pleadings was that we, the plaintiffs, didn't discover Dr. Saab's misstatement in time," and that, "*[N]owhere in the response of pleadings to our Section 2—1401 petition has Dr. Saab denied the accuracy of our allegation that he, Dr. Saab was, in fact, contacted by Dr. Mayor,* and nowhere does Dr. Saab state Dr. Carden and Dr. Chessick are incorrect in stating that his failure to come over to the hospital at that time was a departure from the standard of care, *i.e.*, malpractise [*sic*]."

The trial court concluded that Dr. Saab's affidavit and deposition were false and, by reason thereof, granted plaintiffs' section 2—1401

petition and vacated the summary judgment which dismissed Dr. Saab as a party defendant, in the following colloquy:

"THE COURT: [I]t would certainly appear that there was false representations either in that affidavit or in the deposition testimony ***. There is Ostendorf and there is Lubbers.[2] Lubbers is a little bit different in that not only in the Lubbers case did they give false information but they threatened a witness who knew that the information was false. So, there is no charge that took place here, but it is terribly similar to the Ostendorf case it seems to me, and for that reason the motion is—the September 25, 1984, order is being vacated.

[Dr. Saab's Attorney]: Your Honor, could we have—you are expressing and finding that the due diligence requirement under Section 2—1401 has been met also?

THE COURT: I am saying that because of this—I am going to say allegedly false information, that it totaled the running of the time.

[Dr. Saab's Attorney]: Of the due diligence requirement, so to speak.

THE COURT: Yes. That's what Ostendorf said." (Emphasis added.)

The trial court vacated the summary judgment on its finding that the summary judgment was predicated on Dr. Saab's false affidavit and deposition. The majority, however, improperly reverses the trial court's order on a totally different basis, i.e., plaintiffs' lack of diligence in obtaining Dr. Mayor's deposition which established the falsity of Dr. Saab's affidavit and deposition testimony. From the hereinbefore verbatim quoted trial court record, it is quite apparent that this record more than adequately supports the trial court's finding. Moreover, the hereinbefore verbatim quoted trial court record also clearly contradicts the majority's erroneous and record unsubstantiated conclusion that, "We find nothing in the record to support plaintiffs' claim that Saab testified untruthfully during his deposition in an attempt to misrepresent that the December 10, 1982, telephone call did not take place [and] that Saab has steadfastly maintained throughout that he so testified truthfully." These conclusions by the majority simply are unsupported in the record. Conversely, the record, as hereinbefore verbatim quoted, is abundantly to the contrary and affirmatively establishes that Dr. Saab never refuted, disputed,

---

[2]Ostendorf v. International Harvester Co. (1982), 89 Ill. 2d 273, 433 N.E.2d 253; Lubbers v. Norfolk & Western Ry. Co. (1984), 105 Ill. 2d 201, 473 N.E.2d 955.

disclaimed, explained or denied the falsehoods attributed to him in his affidavit and deposition testimony by Dr. Mayor's contrary deposition testimony.

The majority additionally takes the contrary and irrelevant position that even if Saab misrepresented that he did not receive the telephone call, "such a misrepresentation, even if substantiated, in no way prevented plaintiffs from discovering the evidence necessary to refute those statements and thereby raise an issue and fact to avoid summary judgment." (184 Ill. App. 3d at 958.) Inasmuch as the summary judgment was predicated on Dr. Saab's misrepresentations, as the trial court found, and which finding was substantiated and which misrepresentations plaintiffs *did* ultimately discover, under the authorities of *Ostendorf v. International Harvester* (1982), 89 Ill. 2d 273, and *Lubbers v. Norfolk & Western Ry. Co.* (1984), 105 Ill. 2d 201, the fact that Dr. Saab's misrepresentations were not discovered before, but were first discovered after entry of summary judgment, were irrelevant to the merits of the motion to vacate the summary judgment, the entry of which was predicated on the misrepresentations.

As authority for vacating the summary judgment, based on its finding that it was predicated on Dr. Saab's false affidavit and deposition testimony, the trial court expressly relied on *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, and *Lubbers v. Norfolk & Western Ry. Co.* (1984), 105 Ill. 2d 201. Not only was that reliance warranted, it was also mandated.

The facts and issues in *Ostendorf* and the case at bar are practically identical. In *Ostendorf*, plaintiff brought suit against International Harvester to recover for burn injuries he sustained when the fuel tank filler cap of an International Harvester tractor he was operating blew off, causing gasoline to gush out of the tank, ignite and burn plaintiff. Based upon strict products liability, plaintiff alleged that the design and manufacture of the gas tank and gas cap on the tractor rendered it unreasonably dangerous when put to its intended use. The jury returned a verdict in favor of the defendants and judgment was entered thereon which was affirmed on appeal. (*Ostendorf v. Brewer* (1977), 51 Ill. App. 3d 1009, 367 N.E.2d 214, *appeal denied* (1978), 67 Ill. 2d 593.) On May 25, 1979, plaintiff filed a petition under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72), currently section 2—1402 (Ill. Rev. Stat. 1985, ch. 110, par. 2—1402), to vacate the judgment entered in favor of Harvester on December 17, 1975, 3½ years previously. Plaintiff asserted in his petition to vacate the judgment "that International Harvester had

given false answers to plaintiff's [pretrial] interrogatories" and had fraudulently concealed evidence "in the earlier action." Unlike in the case at bar, in *Ostendorf*, defendant International Harvester's initial response was that it had not given false answers to the interrogatories and had not fraudulently concealed evidence. In the case at bar, Dr. Saab has not controverted the falsehoods attributed to him by the plaintiffs. In *Ostendorf*, the defendant, International Harvester, as did the defendant Dr. Saab in the case at bar, urged that the petition to vacate was untimely. The trial court agreed in *Ostendorf* and dismissed the petition to vacate the judgment. The trial court disagreed in the case at bar, however, and vacated the judgment. In *Ostendorf*, the appellate court reversed and remanded the cause for an evidentiary hearing on the issue of fraudulent concealment and whether International Harvester had given false answers to the interrogatories. (*Ostendorf*, 88 Ill. App. 3d 316.) The supreme court granted leave to appeal and reiterated that, "A motion to dismiss admits all well-pleaded facts. *** We have repeatedly held that a motion to dismiss should not be granted unless it clearly appears that no set of facts could ever be proved that would entitle the plaintiff to recover." 89 Ill. 2d at 280.

The supreme court further pointed out in *Ostendorf* that plaintiff's petition to vacate the judgment, significantly, "alleged that International Harvester gave false answers to interrogatories and withheld test reports and other information demanded by the interrogatories." (89 Ill. 2d at 280.) One of plaintiff's interrogatories sought information concerning any tests conducted by International Harvester on the tractor's fuel system, to which International Harvester responded, "Detailed records concerning specific tests are no longer available." (89 Ill. 2d at 280.) Other interrogatories by plaintiff asked if any personnel of International Harvester had ever expressed an opinion against using the gasoline tank on the tractor or if International Harvester had ever had any recommendation against the use of the gasoline tank on the tractor. International Harvester answered, "Not to our knowledge," (89 Ill. 2d at 281) to each of these pretrial interrogatories by plaintiff. There was set forth in plaintiff's petition to vacate the judgment in favor of International Harvester affidavits and reports of tests of the tractor's fuel system conducted by International Harvester and recommendations against its use, acquired by plaintiff long after the judgment had been entered. In vacating the trial court's order which dismissed plaintiff's petition to vacate the judgment on the grounds that it was insufficient and not timely, in language uniquely applicable to the case at

bar, the supreme court held:

"The existence of these reports, which are clearly material embraced by the interrogatories, demonstrates International Harvester's failure to comply with the requirements of full and frank disclosure imposed by our discovery rules. In light of these documents, *International Harvester's responses were, if not outright falsehoods, half-truths of the type condemned in Buehler v. Whalen* (1977), 70 Ill. 2d 51, 64-68. *In the context of discovery, which is supposed to be conducted in good faith and a spirit of cooperation for the purpose of ascertaining the truth, such half-truths are equivalent to outright lies.* They have the effect of affirmative concealment, since they imply that there is no information or evidence to be sought. *They inevitably tend to mislead opposing counsel into the belief that further inquiry is not needed.*

We have very recently reiterated our views for the purpose of discovery and the conduct expected of parties in the discovery process. *Discovery is intended to be a mechanism for the ascertainment of truth, for the purpose of promoting either a fair settlement or a fair trial. It is not a tactical game to be used to obstruct or harass the opposing litigant.* (*Williams v. A.E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 564-66, and cases there cited.) 'Fractional disclosure' in discovery is not the disclosure contemplated by our discovery rules. (*Buehler v. Whalen* (1977), 70 Ill. 2d 51, 67-68.) *We hold that, as a matter of law, failure to comply with the obligation of full and truthful disclosure imposed on litigants by our discovery rules constitutes fraudulent concealment for purposes of tolling a statute of limitations.*" (Emphasis added.) 89 Ill. 2d at 282.

The supreme court addressed the issue of plaintiff's diligence by his belated discovery of the falsehoods in *Ostendorf* in the following language, again uniquely applicable to the facts in the case at bar:

"As regards petitioners' diligence in discovering the ground for relief, *we think a litigant exercises ordinary diligence in pretrial discovery when he poses interrogatories reasonably calculated to elicit the information important to his case. If his opponent then suppresses information within the scope of the interrogatories in such a way as to prevent the inquirer from realizing what has occurred, the failure to discover the information is the result of the former's fault, not of the latter's negligence.* \*\*\*

*One of the guiding principles in the administration of section 72 relief is that the petition invokes the equitable powers of the court, which should prevent enforcement of a judgment when it would be unfair, unjust, or unconscionable. (Elfman v. Evanston Bus Co. (1963), 27 Ill. 2d 609, 613; Ellman v. De-Ruiter (1952), 412 Ill. 285, 292.) \*\*\* As the court stated in Elfman,* ' "Something more than the morals of a medieval market may reasonably be expected in the conduct of litigation." ' " (Emphasis added.) 89 Ill. 2d at 284-85.

In *Ostendorf,* the defendant's misrepresentations were discovered long after the cause had been tried by a jury, which found in favor of the defendant. In the case at bar, the defendant Dr. Saab's misrepresentations were much sooner discovered and were discovered before trial. Dr. Saab's discovery deposition was clearly "calculated to elicit information important to the case." Dr. Saab answered the questions put to him during his deposition "in such a way as to prevent the inquirer from realizing what [had] occurred" and "the failure to discover the information [was] the result of [Dr. Saab's] fault, not of [plaintiff's] negligence." The guiding principles in the administration of section 2—1401 relief, "that the petition invokes the equitable powers of the court [to] prevent enforcement of a judgment when it would be unfair, unjust or unconscionable," are clearly applicable to the case at bar. The trial court's order vacating the summary judgment was fair, just and conscionable. Enforcement of the summary judgment dismissing Dr. Saab as a party defendant based on his falsehoods is "unfair, unjust and unconscionable." *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 285.

*Lubbers v. Norfolk & Western Ry. Co.* (1984), 105 Ill. 2d 201, the other authority on which the trial court relied, demanded that the trial court vacate the summary judgment in favor of Dr. Saab. In *Lubbers,* plaintiff sued to recover for injuries he sustained when the grain truck he was driving was struck by defendant's train at a railroad crossing. The defendant railway company filed a counterclaim against Lubbers. Lubbers' complaint alleged that the defendant railway company was negligent in failing to provide, maintain or operate adequate and nondefective crossing lights to warn him of the oncoming train. In answers to Lubbers' interrogatories, the defendant railway company stated that the flashing crossing lights had been periodically inspected and were properly functioning before and at the time of Lubbers' accident. The defendant railway company named numerous individuals in its answers to Lubbers' interrogatories who had seen the flashing crossing lights properly functioning on the date

of the accident. The jury found against Lubbers and awarded defendant railway company $650 for damages on which judgment was entered. The judgment was affirmed on appeal. (*Lubbers v. Norfolk & Western Ry. Co.* (1980), 89 Ill. App. 3d 1205 (Supreme Court Rule 23 order).) Over two years later Lubbers filed a petition under section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2—1401) to set aside the judgment and for a new trial on the grounds that the defendant railway company's aforesaid answers to Lubbers' interrogatories concerning the inspection and operation of the crossing signals and the railway reports thereof were false. The trial court denied Lubbers' petition to vacate. The appellate court reversed on the authority of *Ostendorf.* The supreme court granted leave to appeal, affirmed the appellate court and remanded the cause to the trial court with directions to grant Lubbers leave "to amend his section 2—1401 petition in view of the resolution of this case by this court." *Lubbers,* 105 Ill. 2d at 214.

Contrary to *Lubbers* and *Ostendorf,* the majority in the case at bar mistakenly conclude that plaintiffs were obligated to promptly depose Dr. Mayor after Dr. Saab denied in his deposition that he had any connection with the deceased to verify or dispute Saab's denial and that because plaintiffs did not do so, plaintiffs were not diligent and therefore forfeited their right to set aside the summary judgment. *Ostendorf* and *Lubbers* expressly hold to the contrary. *Ostendorf* and *Lubbers* clearly hold that plaintiffs in the case at bar were justified in relying on the veracity of Dr. Saab's deposition testimony, that plaintiffs were under no legal obligation to immediately thereafter pursue an expedition to discover if Dr. Saab's deposition testimony was truthful or false and that plaintiffs were not guilty of a lack of diligence in not so doing. The supreme court held in *Lubbers:*

> "The [section 2—1401] petition in this case was not untimely, and Lubbers was not guilty of lack of diligence. As we stated in *Ostendorf,* '[A] *litigant exercises ordinary diligence in pretrial discovery when he poses interrogatories reasonably calculated to elicit the information important to his case. If his opponent then suppresses information within the scope of the interrogatories in such a way as to prevent the inquirer from realizing what has occurred, the failure to discover the information is the result of the former's fault, not of the latter's negligence.'* \*\*\* Nor do we find Norfolk's contention that Lubbers failed to depose any of the Norfolk employees whose names were given in answer to interrogatories or to examine the items submitted in response to Lubbers' request for docu-

ments to be significant. *As made clear in Ostendorf, the diligence requirement of section 2—1401 does not go so far as to force parties acting in good faith to assume the possibility of fraud in the answers to discovery requests and to take extraordinary steps to discover it in the limited time they have before trial.* There is no indication here that Lubbers had reason to suspect that anyone was engaging in deception ***. Even if it were conceded that depositions of employees or examination of documents would have revealed evidence that Norfolk had neglected to examine the signal and later attempted to conceal its neglect, *** *it would distort the concept of equity to hold that diligence required Lubbers to depart from his chosen pretrial strategy to anticipate or guard against the kind of chicanery alleged here.*" (Emphasis added.) (105 Ill. 2d at 210-11.)

It, too, distorts the concept of equity to hold that diligence required plaintiffs to anticipate and guard against the kind of chicanery in which Dr. Saab engaged in the case at bar.

The supreme court pointed out further in *Lubbers* that the defendant Railway's answers to Lubbers' interrogatories were "intended to and did frustrate the discovery process," that "[s]uch conduct is especially to be condemned because discovery is supposed to enable counsel to decide in advance of trial not only what the evidence is likely to be but what legal issues can credibly be argued," that "[p]arties should not be permitted to avail themselves of a verdict obtained by deluding an opponent as to what the facts or the issues in a case really are," and that "the 'outcome-determinative' requirement of section 2—1401 is met if it reasonably appears that the undiscovered evidence which was wrongfully withheld or falsified in discovery would have prevented the entry of the judgment." (105 Ill. 2d at 213.) Dr. Saab did not contend below and does not contend here, and indeed Dr. Saab could not possibly contend that it does not reasonably appear that his undiscovered false deposition testimony would have prevented the entry of the summary judgment dismissing him as a party defendant.

The majority's attempt to distinguish *Ostendorf* and *Lubbers* from the case at bar is fallacious. The judgment sought to be vacated by the section 2—1401 petition in each case was predicated on the defendant's false answers in response to plaintiffs' pretrial discovery, and to that extent, of course, they each also involved the defendant's fraudulent concealment of evidence favorable to the plaintiffs. In *Lubbers* and *Ostendorf,* the defendants additionally affirmatively con-

cealed other evidence favorable to the plaintiff, which is the stated, but invalid, distinction on which the majority rejects their application to the case at bar. The learned trial judge properly held that *Ostendorf* and *Lubbers* were controlling and correctly vacated the summary judgment in favor of Dr. Saab. I agree with that ruling and I would affirm it.

The single authority, *Malek v. Lederle Laboratories* (1987), 152 Ill. App. 3d 493, 504 N.E.2d 893, on which the majority relies to reverse the trial court's ruling is not remotely analogous to the case at bar. *Malek* did not involve vacating a judgment which was predicated on a defendant's falsehoods. *Malek* involved a section 2—1401 petition to vacate a judgment entered on a jury's verdict for defendants after a trial on plaintiff's complaint for alleged personal injuries from defendants' vaccine on a negligence and products liability theories. The belated grounds asserted by plaintiff in the section 2—1401 petition to vacate the judgment was the defendants' legitimately claimed pretrial withholding of documents from plaintiff, of which plaintiff was apprised and to which plaintiff acquiesced before trial. *Malek* is no authority for the grave inequity and injustice which reversal of the vacatur of the summary judgment perpetrates in the case at bar.

Moreover, the majority's holding in the case at bar distorts the legislatively imposed time requirements and restrictions of section 2—1401. Section 2—1401(a) provides in pertinent part that, "Relief from final orders and judgment, after 30 days from the entry thereof, may be had upon petition as provided in this Section." (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401(a).) Section 2—1401(c) provides that, "The petition must be filed not later than 2 years after the entry of the order or judgment. Time during which *** the ground for relief is fraudulently concealed shall be excluded in computing the period of 2 years." Ill. Rev. Stat. 1981, ch. 110, par. 2—1401(c).

Dr. Saab gave his false deposition on February 6, 1984. The summary judgment dismissing Dr. Saab as a party defendant was entered on September 24, 1984. Plaintiffs discovered Dr. Saab's "fraudulently concealed" deposition testimony on September 3, 1985, when Dr. Mayor was deposed, and on November 8, 1985, plaintiffs filed their section 2—1401 petition to vacate the judgment, well within "2 years after the entry of the order or judgment," without excluding from the two-year period, the "time during which *** ground for relief is fraudulently concealed," February 6, 1984, the date of Dr. Saab's false deposition, to September 3, 1985, the date on which Dr. Mayor's deposition revealed that Dr. Saab's February 6, 1984, deposition was false. The majority's holding in the case at bar

runs afoul of the legislative time mandated in the statute, for which reason I also disagree with the majority and would affirm the trial court's vacatur order.

After the majority opinion reversing the trial court's vacatur of the summary judgment in favor of defendant, Dr. Saab, was filed on July 29, 1988, and after my dissenting opinion was filed herein on August 19, 1988, the court on September 29, 1988, granted plaintiff-appellant Altair Goncaves' petition for rehearing and set oral argument thereon for February 7, 1989. On December 22, 1988, this court decided *Johnson v. Steiner* (1988), 179 Ill. App. 3d 556. During oral argument on rehearing, Dr. Saab's attorney relied on *Johnson.* That reliance was ill-founded.

In *Johnson,* a medical malpractice action for defendants' alleged failure to properly treat plaintiff's fractured wrist arising out of an automobile accident, the trial court entered summary judgment dismissing Drs. Patel and Steiner as defendants, based on their affidavits. Dr. Patel's affidavit stated that he did not practice radiology or orthopedics, that he never examined or treated plaintiff's injured wrist, that he was never asked to do so, and that his treatment of plaintiff was exclusively as a consultant and only regarding plaintiff's abdominal injuries, of which plaintiff made no complaint. Dr. Steiner's affidavit stated that defendant Cardiovascular and Pulmonary Associates was his solely owned professional corporation and that he too did not practice radiology or orthopedics, that he never examined or treated plaintiff's injured wrist and he was never asked to do so, that his treatment of plaintiff was exclusively as a consultant and only regarding plaintiff's hypertension and potassium, of which plaintiff made no complaint.

Plaintiff's subsequent section 2—1401 motion (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401) in *Johnson,* to vacate the summary judgment in favor of Drs. Patel and Steiner, alleged that the subsequent newly discovered deposition evidence of defendants Drs. Parkh and Cabin revealed that Drs. Patel and Steiner had the overall responsibility for plaintiff's care and that Dr. Patel's and Dr. Steiner's affidavits were therefore false and perjurious, The trial court in *Johnson did not* find that Dr. Patel's and Dr. Steiner's affidavits were false, whereas in the case at bar, it is clear from counsel's arguments and colloquy and the trial court's remarks, findings and vacatur of the summary judgment in favor of Dr. Saab, that the trial court *did* find that Dr. Saab's affidavit and deposition were perjurious.

Unlike in the case at bar, in *Johnson* the trial court found that plaintiff's attorney did not exercise due diligence to discover the new

evidence and denied plaintiff's section 2—1401 motion to vacate the summary judgment in favor of Drs. Patel and Steiner; whereas, in the case at bar, the trial court granted plaintiff's section 2—1401 motion to vacate. On appeal this court held in *Johnson* that the trial court *did not* abuse its discretion in denying the plaintiff's vacatur motion; whereas, on the instant appeal, the majority holds that the trial court *did* abuse its discretion in granting plaintiff's vacatur motion. In the instant appeal, the majority does not hold that the trial court's finding, that Dr. Saab's affidavit that he had nothing to do with plaintiff's treatment was perjurious, was incorrect, erroneous, or unsupported by the evidence, or that the trial court in any way abused its discretion in so finding, or that the trial court should not have so found. Conversely, in *Johnson*, this court pointed out and held, "Where a section 2—1401 petition seeks relief based upon alleged perjured testimony, it must be shown by clear, convincing and satisfactory evidence that the testimony was not only false, but that it was willfully and purposely falsely given. [Citation.] Plaintiff's section 2—1401 petition falls far short of this mark. *Plaintiff failed to allege any facts even remotely demonstrating that Patel and Stein willfully and purposely lied in their affidavits.*" (Emphasis added.) (*Johnson*, 179 Ill. App. 3d at 561-62.) Not so in the instant case, for here plaintiff alleged wilful perjury, and, again, in the proper exercise of its function, and with more than an adequate evidentiary basis to support it, the trial court found that Dr. Saab's deposition and affidavit were perjurious. The majority has not contrarily found, disturbed, or even criticized that finding, neither in its original opinion nor in its opinion on rehearing. Instead, the majority has ignored it. By reason of its appropriate finding of perjury, the trial court correctly vacated the summary judgment in favor of Dr. Saab dismissing him as a defendant. There is absolutely no valid indication that the trial court abused its discretion in so doing, in spite of the majority's unwarranted contrary assertion. *Johnson* is no authoritative precedential solace to the defendant Dr. Saab.

It must be borne in mind that Dr. Saab's attorney, Ms. Mary O'Connor, was present at his deposition when he testified, under oath, that he never received a telephone call concerning and that he had nothing to do with the consultation, treatment or care of the patient, plaintiff Altair Goncaves. It must be also borne in mind that at Dr. Saab's deposition his attorney, Ms. Mary O'Connor, asked him if he "*ever advise[d] in any medical capacity as to the care and treatment that was to be taken for [Goncaves's] treatment?*" and if he "*ever at any time physically monitor[ed] this patient's care on his*

*clinical status,"* to which questions Dr. Saab answered *"No."* (Emphasis added.) It must be further borne in mind that Dr. Saab's attorney prepared and presented to the trial court Dr. Saab's affidavit that Dr. Saab did not examine, care for, treat or come in contact with plaintiff Altair Goncaves at any time during his stay at St. Anne's Hospital. Additionally, it must be borne in mind that Dr. Saab's attorney presented to the trial court Dr. Saab's deposition and affidavit in support of Dr. Saab's motion for summary judgment to be dismissed as a defendant and requested the trial court to rely on the veracity and integrity of said documents. The trial court did so and granted his motion for summary judgment.

Ms. Lisa Marco Kouba represented Dr. Saab during the original and during the rehearing of oral arguments on the instant appeal before this court. Ms. Kouba, Dr. Saab's appeal attorney, and Ms. O'Connor, Dr. Saab's trial attorney, are associates in the same law firm, and both their names appear of counsel on Dr. Saab's briefs filed in this court. The knowledge and acts of each in the case at bar in the trial court and in this court are therefore chargeable to both.

During oral argument on rehearing, the court asked Dr. Saab's appellate attorney, Ms. Kouba, if plaintiff's attorney should have relied on the defendant Dr. Saab's deposition and affidavit in the trial court. Her answer was that plaintiff's attorney should not have done so. In response to the court's further questions during oral argument on rehearing, Dr. Saab's appellate attorney, Ms. Kouba, additionally stated that she would not have relied on Dr. Saab's deposition or affidavit in the trial court if she had been plaintiff's attorney. Yet, Ms. Kouba's associate and Dr. Saab's trial court attorney, Ms. O'Connor, as previously pointed out, took Dr. Saab's deposition and affidavit, presented same to the trial court, and asked the trial court to rely thereon in granting Dr. Saab's motion for summary judgment. Whether Ms. Kouba's unwillingness to have relied on her client's deposition and affidavit was based on some privileged communication from her client to her and/or her associate, Ms. O'Connor, or whether her refusal to rely on her client's deposition and affidavit was based on information from some other source has not been revealed. Nevertheless, because of these aforementioned circumstances, it is patently clear to me that it is grossly unfair and unjust to compel plaintiff to be detrimentally bound by his attorney's good-faith, but mistaken, reliance on Dr. Saab's deposition and affidavit. To so require, in my judgment, flagrantly violates basic and fundamental fairness.

What is before this court for our review simply is a case in which

a physician allegedly neglected to fulfill his professional duty to a patient. The patient died. In this suit against the physician because of the patient's death, the physician lied about his failure to have performed his medical duties, and based thereon he was dismissed from the suit. The patient's alleged wrongful death goes unredressed and the physician has successfully avoided the legal consequences of his initial misconduct in the hospital by additional subsequent misconduct in the courtroom. Thus, the doctor benefits from his prevarications, because his lies have been sanctioned by this court.

This court held in *People v. Shannon* (1975), 28 Ill. App. 3d 873, 878, 329 N.E.2d 382, that the use of "perjured testimony is a miscarriage of justice which is abhorrent to fundamental fairness and as such is intolerable. *Perjury is the mortal enemy of justice,* and the battle between them must be waged at every level, including the constitutional. For the administration of human justice, the Eighth is the first and the greatest Commandment." (Emphasis added.) The supreme court also held in *People v. Cornille* (1983), 95 Ill. 2d 497, 508, 511, that, *"Perjury is the mortal enemy of justice"* and that *"the truth seeking function is corrupted by *** perjury."* (Emphasis added.) Regarding the use of perjured testimony in a judicial proceeding, the Supreme Court of the United States held in *Mesarosh v. United States* (1956), 352 U.S. 1, 14, 1 L. Ed. 2d 1, 9-10, 77 S. Ct. 1, 8:

> "Mazzei, by his [perjured] testimony, has poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity. *** [T]his Court has supervisory jurisdiction over the proceedings of the federal courts. If it has any duty to perform in this regard, it is to see that the waters of justice are not polluted. Pollution having taken place here, the condition should be remedied at the earliest opportunity.
>
> 'The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts. *** Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.' [Citation.]"

The New York Court of Appeals stated in *People v. Savvides* (1956), 1 N.Y.2d 554, 557, 136 N.E.2d 853, 854, 154 N.Y.S.2d 885, 887, that "A lie is a lie, no matter what its subject ***." In language applicable to the instant case, our supreme court stated in rul-

ing adversely to a defendant because of his deception in the trial proceedings, "To now reward defendant's deceit with a new trial would make a mockery of the truth-seeking process upon which our system of justice is founded."

Although these foregoing authorities were criminal and not civil, certainly the law makes no distinction of perjury on such a tenuous, meaningless and absolutely insignificant basis.

The trial court in the case at bar, in the proper exercise of its function, found that Dr. Saab's deposition and affidavit were perjured. The record abundantly supports that finding. The trial court did not abuse its discretion in so concluding and in rejecting Dr. Saab's argument that the summary judgment in his favor should not be vacated because of plaintiff's attorney's purported lack of diligence. By reversing the trial court's vacatur of Dr. Saab's summary judgment, the majority has judicially prioritized and elevated plaintiff's attorney's justified lack of diligence over Dr. Saab's inexcusable perjury. The judiciary should not permit a litigant to so advantageously exploit and simultaneously denigrate and deprecate the Halls of Justice. I therefore cannot accept this assessment. Indeed, I vigorously reject it. Accordingly, I dissent.